578 A.2d 468

**J.H. FRANCE REFRACTORIES COMPANY and the Van Brunt Company,[1] Appellants,**

**v.**

**ALLSTATE INSURANCE COMPANY, PMA Insurance Company, St. Paul Insurance Company, U.S. Fire Insurance Company, Wausau Insurance Company and Rockwood Insurance Company, H.K. Porter Company, Inc., and Armstrong World Industries, Inc., Insurance Company of North America.**

Superior Court of Pennsylvania.

Argued Oct. 23, 1989.

Filed July 27, 1990.

**1.** Although the caption reflects the parties as set forth at No. 01262 Philadelphia, 1986, the opinion applies to all the appeals taken by the various parties at the docket numbers indicated in the caption.

188

Mark D. Turetsky, Norristown, for appellants.

John C. Sullivan, Philadelphia, for Allstate Ins., appellee.

Earl T. Britt, Philadelphia, for PMA Ins., appellee.

Ralph L. Hose, Ardmore, for St. Paul Ins., appellee.

E. Max Weiss, Meadville, for U.S. Fire Ins., appellee.

William F. Sullivan, Jr. for Wausau Ins., appellee.

Michael Kubacki, Philadelphia, Rockwood Ins., appellee.

Before CIRILLO, President Judge, and CAVANAUGH, BROSKY, OLSZEWSKI, DEL SOLE, MONTEMURO, TAMILIA, KELLY and JOHNSON, JJ.

BROSKY, Judge.

This is a consolidated appeal from an order issued in a declaratory judgment action. The controversy, although involving many parties, delineates into one of a manufacturer against its insurers in an effort to determine the obligations of the various insurers who provided coverage during periods relevant to the numerous asbestos and asbestos related disease cases filed against the France company. Although numerous stated issues have been raised on appeal, they break down, generally speaking, into questions of: (1) when, for purposes of liability insurance coverage, does one sustain bodily injury in an asbestos context, or

alternatively stated, at what point in the asbestos disease process is liability coverage triggered; (2) whether the manufacturer must bear a portion of the liability expenses when it is uninsured during the claimant's exposure to its asbestos containing products; (3) whether the differing insurer's obligations are cumulative, and (4) whether the insurers acted in bad faith in refusing to defend, thus, obligating them to pay attorney's fees to France.

Upon considerable contemplation of arguments advanced by all parties and amicus, and upon consideration of the comprehensive opinion of the Honorable Harry Takiff of the Court of Common Pleas of Philadelphia County, and the wealth of authority in various other jurisdictions, we affirm the order appealed from as to the determination of trigger of coverage and the denial of attorney's fees. We reverse that portion of the order designating the obligations of the insurers whose policies are triggered, and in its stead, we offer a different approach which is discussed more fully *infra.*

## FACTUAL BACKGROUND:

J.H. France is a manufacturer of asbestos containing bricks and other refractory products. The Van Brunt Company was, prior to June, 1983, a "jobber" of France's products, at which time it became a division of France. The insurers that are parties to this suit have, at various times, provided general liability coverage to France.[2] The first lawsuit filed against France claiming injury as a result of exposure to its products was filed on April 19, 1979. This suit against France alleged that the plaintiff's decedent had been exposed to various asbestos containing products, man-

2. The various insurer's period of coverage is as follows:

| | | | |
|---|---|---|---|
| PMA | July 1, 1967 | – | July 1, 1976 |
| St. Paul | July 1, 1976 | – | July 1, 1977 |
| All State | July 1, 1977 | – | July 1, 1979 |
| U.S. Fire | July 1, 1979 | – | June 3, 1980 |
| Wausau | June 3, 1980 | – | October 30, 1983 |
| Rockwood | October 30, 1983 | – | October 30, 1984 |

ufactured by various companies including France, during the years 1948 to 1978, and that manifestation of the disease occurred during a hospitalizàtion of the decedent in January of 1979. Upon receipt of the complaint in the above mentioned suit, France tendered the claim to Allstate, and eventually to St. Paul and PMA, for indemnity and defense. However, none of the insurers agreed to defend and indemnify France prompting France to file the present action for declaratory relief. Since that time France has been named as a defendant in numerous other asbestos or silica related cases. Any defense which has been provided by an insurer has been done under a reservation of rights.

The case proceeded to trial before the Honorable Harry Takiff, of the Court of Common Pleas of Philadelphia County, in an effort to determine which of France's insurers was/were responsible for providing a defense and indemnifying France in the various suits, and also to establish rules for the determination of coverage obligations in any future cases to be filed against France. France purchased general comprehensive liability insurance from 1967 and has maintained coverage at all times relevant to the present action. All of the policies contained language that was similar in import, if not identical, as to all material phrases. The policies provided:

> [The company] will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and [the Company] shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage....

> "Bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom....

> "Occurrence" means an accident, including continuous or repeated exposure to conditions, which result in bodily

injury or property damage neither expected nor intended from the standpoint of the Insured.

The insurers tended to offer differing theories of when the coverage obligation is triggered, due in part, perhaps, to the fact that there was and has been, throughout the country, a developing body of case law on this precise question. The so-called "exposure theory" asserts that bodily injury, within contemplation of the policy language, occurs upon exposure to the asbestos or silica product. The proponents of this theory point to the fact that there is competent medical evidence that definite adverse physical consequences occur on a cellular level within a very short time of exposure. It was stipulated here that cells lining the trachea die within one hour after being invaded by an inhaled asbestos fiber. Under this approach any insurer(s) who was at risk during the period the claimant was exposed to the manufacturer's product would incur an obligation to defend and indemnify.

In contrast, some of the insurers have advocated a "manifestation theory." They argue that the exposure theory is overly technical and thwarts the generally held concept of injury, since, exposure itself, does not result in an incapacitation of any cognizable degree. They assert that bodily injury, within the meaning of the policy, refers to that point in time when the disease resulting from the exposure manifests itself as an incapacitating force. Under this approach the insurer at risk at the time the disease manifests itself in a claimant would incur the obligation to defend and indemnify the manufacturer.

The trial court, considering the large volume of medical evidence and the body of case law in other jurisdictions, found that an insurer's obligations under the policy are triggered if its policy was in effect at any time from a claimant/plaintiff's exposure, through progression of the disease to manifestation. Then, recognizing that in a number of cases its holding would result in more than one insurer's policy being triggered, the trial court approved an approach that would require the first policy activated under the above theory to provide a defense and indemnify to the

policy limits. If that policy limit was exhausted, the next in time insurer was then similarly obligated to the extent of its policy limits, and "so on until the claim is settled, judgment is paid or all policy limits are exhausted." (Trial court opinion p. 13). However, if any insurer had issued multiple policies triggered under the above theory, then that insurer would be obligated only to the extent of the highest limit of liability provided. The court also concluded that for any periods of time in which France were uninsured it would be liable for its equitable share of the liability and defense costs. Additionally, the court denied France's claim for attorney's fees based upon a bad faith denial of coverage.

The case was subsequently appealed to this court where it was referred to the court en banc for disposition. However, this court, sitting en banc, found, by a seven to two majority, (Cirillo, P.J. and Brosky, J., dissenting), that the trial court had been without jurisdiction, under the Declaratory Judgment Act, to issue such a judgment as there was a failure to join plaintiffs who had, subsequent to the filing of this case below, filed similar actions against France for personal injury. This court, relying upon our Supreme Court's decision in *Vale Chemical Corp. v. Hartford Accident & Indemnity Co.,* 512 Pa. 290, 516 A.2d 684 (1986), found that the issuance of a declaratory judgment under those circumstances would affect the rights of individuals who were not parties to the litigation. The en banc decision of this court was appealed to the Supreme Court and subsequently reversed, *J.H. France Refractories v. Allstate Insurance Co.,* 521 Pa. 91, 555 A.2d 797 (1989), and remanded to this court for determination of the substantive issues raised originally. Hence, the present opinion.

## INTRODUCTION:

No one has disputed the rather fundamental premise that an asbestos related claim of injury is a compensable occurrence under the various liability policies in question. Thus, the fundamental question presented is what circumstances in the asbestos injury context trigger the obligations of the

policies in effect. In this context all the parties have chosen arguments that would seem to minimize their own ultimate liability under the facts presented, a theme which, quite understandably, seems to run through a majority of the opinions on the issue.

In Pennsylvania, the task of contract interpretation is generally performed by the court. *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563 (1983). The goal of this task is to ascertain and effectuate the intent of the parties. Of course, the written instrument should play an important role in determining the intent of the parties. However, "if it is determined that the language of a policy prepared by an insurer is either ambiguous, obscure, uncertain or susceptible to more than one construction, the language must be construed most strongly against the insurer, and the construction most favorable to the insured must be adopted." *Vale Chemical Co. v. Hartford Accident & Indemnity Co.*, 340 Pa.Super. 510, 490 A.2d 896 (1985), rev'd on other grounds, 512 Pa. 290, 516 A.2d 684 (1986). We have also recognized "that if a policy is reasonably susceptible to two interpretations, it will be construed in favor of the insured in order not to defeat, without necessity, the claim to indemnity which the insured seeks to obtain." *Id.*

Much argument in this case has been expended on the very issue of ambiguity. It is argued by some of the insurers that there is no ambiguity in the phraseology of the policies. Rather, they argue, the relevant provisions are clear and unambiguous and simply require an analysis of the provisions to the factual context presented. It appears to us that the concept of ambiguity, as used in interpretation of contractual provisions, is a rather relative concept. What may appear to be clear and precise terminology in the abstract reading of the document may become rather unclear and imprecise when applied to real factual patterns. Thus, if upon an objective review of the factual pattern presented the policy provisions do not lead one to a

conclusion that seems inescapable, obvious and intellectually honest, then the precision and clarity of the phrases in the abstract would seem to have failed its true purpose and the terms in question cannot truly be considered completely "clear and unambiguous." This is not to say that it is reasonable to expect a document such as an insurance policy to be so precise and comprehensive that it will provide an unequivocal resolution of every possible factual scenario. But, more likely, there is an implicit recognition in law that even the most carefully drafted document and extensively bargained contract will not provide a true proverbial "meeting of the minds" as to all possible, or even likely, scenarios of application. In such cases, contract law requires that the reasonable expectation of the parties be, in essence, imputed as the intent of the parties and, perhaps as important, acquiesced to by the parties to the contract.

There has also been voiced opposition and criticism of the reasonable expectation approach of interpretation relative to the asbestos injury context. The insurers act out of an apparent belief that this approach can only do them harm and has some sort of result oriented and insidious quality. However, we view these concerns as mostly unwarranted and ultimately unsupportable. Any reasonable expectation which would be imputed to the parties by this or any court must necessarily rely upon, and be reasonably consistent with, the written document and phraseology, simply because any interpretation advanced contrary to the contents of the written document could hardly be viewed as "reasonable" to assert; unless good reason in law is advanced for the disregarding of the clearly contrary phraseology.

■ This aside, the reasonable expectation advanced would, by necessity, be either in reasonable conformity to the actual written phraseology or made possible by the relative ambiguity of the phraseology, in either case, leaving the insurer without much credible argument in opposition. Furthermore, the term "reasonable expectation" itself, implies exactly that quality, reasonableness. It is not carte blanche approval of the insured's wildest and most

comprehensive expectation. Rather, it should clearly incorporate an understanding of the general relationship between the parties, the purpose behind their entering a contractual relationship and the relative position of each. In this regard, we view with some incredulity the insurer's attack on what is, perhaps, the leading decision in this area of inquiry, *Keene Corporation v. Insurance Company of North America,* 667 F.2d 1034 (D.C.Cir.1981).

*Keene,* involving the exact controversy before us, was decided with an eye toward the predominant purpose of purchasing liability insurance which, basically, included Keene's reasonable expectation that by purchasing liability insurance it would be insured against liability for asbestos related injury and disease. Although perhaps the Circuit Court's approach may have been unduly skewed towards promoting a freedom from liability approach on behalf of Keene, the general approach is not without utility, nor, do we believe, in primary conflict with the law of contracts. This is so because by acknowledging the primary purpose of the contractual relationship a useful base for analyzing the parameters of the policy is established.

If a party purchases liability insurance, that party has a reasonable expectation that it will be provided indemnification for liability imposed upon it. Although the exact scope of the protection purchased may require reference to the policy, and it may not be reasonable to expect complete freedom from liability simply because insurance has been purchased, any inclusion of provisions or interpretation of such provisions that seems to insulate the insurer from liability or to otherwise reduce the scope of coverage, which the policy as a whole purports to extend, would have to be viewed with great skepticism, lest the very nature of the contractual relationship become an illusion.

Surely, an insurer cannot purport to provide liability coverage, collect premiums for coverage, and then expect proffered interpretations of key provisions which would have the effect of greatly reducing or eliminating indemnification for liability to be seriously entertained by the courts.

The insurer simply must understand that when it holds itself out as a provider of insurance coverage, offers insurance protection and accepts a premium for such coverage, it will be made to provide such coverage within reasonable bounds of construing the policy in question.

## ASBESTOS RELATED DISEASE:

The parties in the present case have stipulated to a summary of medical evidence they would introduce if they were to present evidence at a full medical hearing. Included in the stipulation is the testimony of John Edward Craighead, a clinical pathologist who for many years has studied pneumoconiosis and asbestos related disease. He defines "injury" as a "process which alters structure," and applies the term regardless of whether he is referring to a cell, a tissue, an organ, or the body itself. "Disease" is defined as occurring when "there is an injury and a response to that injury." The presence of asbestos in the lungs stimulates a wide range of reactions, which Dr. Craighead divides into three responses. The first response, characterized as "direct injury," occurs when asbestos fibers in the respiratory tract interact with the membranes of the tracheal lining cells causing the release of enzymes and superoxides which either damage or kill the individual cells. If sufficient cells are damaged, tissue, which is simply the accumulation of cells, is damaged or destroyed. This injury process occurs within one hour of introduction of the asbestos fiber to the cell.

The second response occurs when the presence of asbestos fibers stimulates macrophages to accumulate. Macrophages are scavenger cells which attempt to engorge foreign particles. As the macrophages attempt to ingest the fibers there is a release of enzymes which have a damaging effect on tissue. There is also a chemical reaction which stimulates the production of fibrous tissue. Which, in turn, creates a scar in the injured tissue. The accumulation of the scar tissue in the respiratory system prevents the lung from performing its normal oxygen/carbon-dioxide gas ex-

change. This accumulative process of macrophages, referred to as the "indirect injury" by Dr. Craighead, has been seen to occur within the first month of exposure, and it is indicated that it starts even earlier than that.

The third response in the asbestosis process is the change in the nature of the cells lining the bronchial tree. The normal lining, designed to move dust particles out of the body, is replaced by cells lacking cilia, resulting in the tendency toward accumulation of asbestos particles. Dr. Craighead would also testify that, although there had previously been general acceptance among medical authorities that there existed a clinical progression of asbestosis post exposure, there was substantial doubt developing among leading authorities that this was indeed true. The emerging view theorizes that disease progression may be attributable to the eventual, and inevitable, decrease in the respiratory function involved in the aging process, and also to other factors such as cigarette smoking or infection. Less is known about mesothelioma, a cancer causally linked to asbestos. However, it seems undisputed that it is linked directly to asbestos exposure to the pleural cavity upon which non-malignant lesions develop which then become malignant. The tumor grows and pushes the lung aside adversely affecting respiratory function. Mesothelioma has a lengthy latent residency period, often manifesting twenty or more years after exposure to asbestos.

## ANALYSIS: TRIGGER OF COVERAGE

It seems somewhat difficult to contend that the policies in the present case are clear and unambiguous, at least as applied to the controversies presented to us. Nothing in the policies leads us to a clear and unequivocal application to the asbestos related disease scenario. This does not necessarily mean that we will automatically attempt to construe the policies "against" the insurers, per se. However, inasmuch as we are not led by the terms of the policies to one precise methodology, we will do our best to provide a reasonable construction of the policies in question, keeping

in mind, almost as was done in *Keene*, that the policies were obtained with certain purposes and goals in mind, and that the policies necessarily purported to provide some degree of liability coverage. In essence, our goal will be to provide a construction consistent with, what we believe would be, a reasonable person's expectations in light of the factual scenario presented.

The proponents of the exposure theory point to the medical evidence indicating that distinct bodily injury, on a cellular level, occurs almost contemporaneously with exposure to asbestos. The evidence establishes that individual cells in the trachea die within thirty minutes of being invaded by an asbestos fiber. This, they contend, constitutes a discreet "injury" which, if one continues to be exposed to asbestos, will result in asbestosis, mesothelioma or other asbestos related disease. Under this theory, the asbestos related disease is, primarily, the consequence of an accumulation of discreet cellular injuries directly or indirectly caused or triggered by the embedding of an asbestos fiber in the individual cells of the trachea or lungs. Since the policies define bodily injury as "bodily injury, sickness or disease...." without greater clarification, and since there are undeniable injuries, albeit on a cellular level, it is contended that this form of "injury" triggers coverage under the policy.

In contrast, the proponents of the manifestation theory argue that the term "injury" as used in the policy must be given its every day or common meaning. They argue that the average person does not consider cellular changes in the body to constitute injury. Rather, they contend, the common understanding implies some recognizable loss or impairment of bodily function. Thus, they would contend, injury does not occur until such time as there is a diagnosable or identifiable indication that one has the disease, in other words, when the disease manifests.

Undoubtedly, either theory or approach to the construction of the key phrases in the asbestos context can find legal, logical and medical support. To the extent that

asbestos exposure immediately causes such physical consequences as outlined above, it is not difficult to conclude that there is bodily injury upon exposure. Further, considering that the impairment results as a consequence of an accumulation of the rather discreet injuries, there is adequate reason to focus upon these discreet injuries as true and material bodily injuries which trigger coverage under the policy.

Conversely, to the extent the actual physical impairment does not occur until some time after initial exposure, and to the extent that this is the more precise factor upon which the claim rests, it is not entirely unreasonable to focus upon this occurrence either. However, to focus simply upon the medical questions to determine the legal questions posed, seems, to us, to be focusing on less than the whole picture. We believe it is equally necessary to consider the various non-medical factors as well.

It must be remembered that the essence of the purchase of insurance is a contractual undertaking regarding the deferral and spreading of risk. France purchased insurance in a general effort to limit its level of risk of liability. The insurers issued policies purporting to accept and assume a definite level of that risk in exchange for the payment of premiums. The question we believe to be dispositive is under what circumstances can France reasonably conclude that coverage is provided for the occurrence of asbestos related diseases? Clearly this requires reference to the terms of the policies, but, particularly in light of our conclusion that those terms do not lead an objective individual to one specific methodology in the asbestos disease context, there are other questions to consider.

■ Utilizing this approach to examine the exposure theory, we inquire whether it is reasonable for a manufacturer to conclude that the purchase of insurance, contemporaneously with the manufacturing and distribution of asbestos containing products, would result in the indemnification for liability imposed upon the manufacturer for a third party's contraction of asbestos related disease when it is later

discovered that those products cause cellular injuries short-
ly after exposure and that extended exposure will likely
result in substantial impairment of important bodily func-
tions. Along this line of inquiry a reasonable individual
would examine the policy and see the definitions of bodily
injury and consider the evidence that an individual exposed
to asbestos products is being harmed, even if on a cellular
level, from almost the moment he or she is exposed to it,
and that such discreet injuries will continue to accumulate
until serious bodily impairment or death occurs. One would
also examine the definition of occurrence and see that it
defines occurrence as "including continuous or repeated
exposure to conditions, which result in bodily injury....," a
phrase that would appear to provide coverage for such
injuries that require substantial periods of exposure to
discreetly harmful conditions. One would also consider the
general expectation a manufacturer might develop from the
fact that the manufacturer was purchasing liability cover-
age on an ongoing basis; in other words, the expectation of
security one might reasonably derive from the fact that it
was continuously operating with liability coverage rather
than without it. When all of these factors are considered
we find the conclusion that exposure triggers coverage
under the policy almost inescapable.

First of all, the medical evidence seems to unavoidably
establish that the ultimate bodily injury and incapacitation
sued for is a result of an accumulation of discreet injuries
on a cellular level. Thus, there would be no liability with-
out extensive exposure. Exposure being the ultimate cause
of the eventual incapacitation, it would seem almost com-
pletely incongruous to conclude that exposure does not
trigger the liability coverage.

■ Secondly, clearly the definitions found in the policy
are at least as equally susceptible to this interpretation, if
not more so, than any other. Thirdly, it would seem to
frustrate the reasonably objective purpose and intent of a
liability policy to conclude otherwise. We believe that any
manufacturer who is operating with liability coverage has a

reasonable expectation that any liability, reasonably encompassed within the policy, which is tied to that manufacturing and distributing process will be covered. After all, that is the primary reason the policy was purchased in the first place.

We further find that a contrary interpretation could provide results that seem, to us, far beyond the reasonable expectations of the parties. Consider, for example, a hypothetical situation where a manufacturer of asbestos containing products operates for a twenty year period with liability coverage provided by XYZ company, at which time, for whatever reason, XYZ company refuses to issue further coverage. Assume further that within the next several years a number of suits are filed asserting asbestos related injury caused by the manufacturer's products and that all periods of exposure are found to be within the twenty year insured period although manifestation occurred after the insured period. Under these facts the manufacturer would have paid twenty years worth of premiums yet, unless exposure would be found to trigger coverage, the manufacturer would be left totally unprotected; this, despite the fact that the liability would be directly tied to the cumulative effect of the injuries derived from exposure to the asbestos products over the twenty year insured period. Not only would such an interpretation seem to be grossly inequitable, it would seem to frustrate the generally attributable purpose of purchasing insurance. The insured must be assumed to have purchased the coverage in expectation that the manufacturing efforts would be insulated from liability, and that liability traced to exposure to its products during the insured period would be within the scope of coverage purchased. Further, to the extent this is considered a reasonably imputed expectation of the contracting parties under such a scenario, it must be considered part of the contract.

In contrast, should exposure be found not to trigger coverage, the insurer would reap an unwarranted windfall. It would be insulated from bearing the liability protection it

was reasonably construed to be offering, and thus the risk it was assuming, even though it collected premiums for the entire relevant period. We conclude that such a scenario cannot be considered a reasonable expectation of the parties considering the relevant factors and the phrasing of the policies in question. Thus, we conclude that exposure to asbestos triggers coverage of the liability policy.

We turn next to the inquiry of whether or not it is reasonable to expect that the purchase of liability insurance would cover liability for incapacity developing and *manifesting* during a period of time when the policy was in effect. Turning to the definition of injury we see that it states "bodily injury, sickness or disease sustained by any person which occurs during the policy period,...." Of course, the manifestation proponents have already provided some of the arguments for finding this theory of trigger valid. The term injury, in common parlance, may very well focus on an incapacitation of a bodily function or functional impairment. The fact that one has sustained numerous cellular injuries is, of course, relevant. But, from a practical standpoint, the manifestation is just as relevant since it focuses on the end result of the accumulation of cellular injuries.

It is noteworthy that injury is defined as encompassing not only injury in fact, but also sickness and disease. These terms, given their general meaning, encompass progressive and/or transitory processes of the body, more so than a momentary occurrence of injury which produces an immediate physical incapacitation. Since, within the policy, the phrase "injury" is defined in a rather broad fashion to include disease and sickness, and keeping in mind the clinical definition of disease provides that disease is *injury and response to injury*, it is not difficult to conclude, considering only the terminology used, that the policy encompasses the entire disease process, from exposure to manifestation of incapacitation. Noting as well that liability insurance policies are generally occurrence-based policies focusing on the legally compensable occurrence, we consider the propo-

sition that the occurrence of manifestation is an appropriate trigger.

Certainly the utilization of this trigger has an appealing simplicity and practicality to it. The manifestation of disease is a recognizable event which has substantial legal significance. It signals the start of the limitations period and marks the point in time that there is a legally cognizable tort action available to the sufferer. Further, the nature of the disease is progressive; clearly incapacity can develop and worsen even after exposure has ended.[3] Thus, given the policy language and the progressive nature of the disease, a reasonably objective individual/manufacturer could expect coverage to be provided when there is a manifestation of the disease within the policy period. Therefore, we conclude, as did the trial court, that the entire process of asbestosis and asbestos related disease, from initial exposure to manifestation, triggers coverage under the policies in question.

Our decision that the entire process from exposure to manifestation triggers coverage is consistent with this court's decision in *Vale Chemical Company v. Hartford Accident and Indemnity*, 340 Pa.Super. 510, 490 A.2d 896 (1985). In that case, a panel of this court concluded, in considering a latent disease case where the disease was

3. In light of the medical evidence presented, we acknowledge the clinical evidence that calls into question the progressive nature of the disease post exposure. However, the evidence on a clinical level may be somewhat too specialized for our purposes as to this particular point. Even if the disease, in a clinical sense, does not progress significantly after exposure is halted, there can be significant development of incapacitation post exposure. Clearly an individual has a right to be free of injury to his lungs and respiratory system. Given that there is a natural and inevitable decrease in respiratory function with aging, the difference between normally functioning lungs, for a person of a given age, and abnormally functioning lungs may revolve around the effect of exposure to asbestos and the progression of the disease. An individual who would have a normal respiratory function for his or her age, may suddenly find oneself increasingly impaired due to the effects of previous exposure to asbestos. Clearly, this incapacitation is compensable in tort even if not completely attributable to exposure to asbestos. Thus, the period of progression of incapacitation post exposure would be relevant to liability coverage questions.

caused by the ingestion of a drug during pregnancy, that the theory espoused in *Keene, supra,* best effectuated the reasonable expectations of the parties and the general expectations of the insured. We would note that there existed stronger logical reasons for adopting an exposure-only theory in *Vale.* In *Vale* the plaintiff was claiming injury suffered from a drug her mother ingested during the pregnancy in which she carried the plaintiff. As such, the exposure period was well defined and all subsequent injuries tied to the drug must have originated from that particularly specific period of time. Nevertheless, the panel of this court found that the entire disease process triggered coverage under the applicable policies. Our decision is also consistent with that reached by the Third Circuit Court of Appeals in *ACandS, Inc. v. Aetna Casualty and Surety Company,* 764 F.2d 968 (3d Cir.1985).

## PRORATION AMONG INSURERS:

█ We turn now to the question of whether France should be found obligated to contribute a portion of the indemnification costs and whether or not there should be a proration among insurers to reflect the proportionate share of their liability. The trial court found that they should not be so held. However, we are unable to agree. The applicable phrase in the policies states:

> [The Company] will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. . . .

The key to our determination that the entire process of asbestosis and asbestos related disease from exposure to manifestation triggers coverage is the recognition that the eventual incapacitation which is sued upon, and thus the more immediately focal event from a liability insurance position, is the result of a process that starts with the first exposure to asbestos and continues until such time as the incapacitation manifests. Further implicit in our determination as to the triggering of coverage is the recognition that

*all parts* of the process are essential to the final insurable event, the incapacitation.

For purposes of illustrating this point, consider the situation where a suit is brought for asbestosis alleging exposure to the manufacturer's product for twenty years. It would be difficult to assert, and even more difficult to conclude, that the first five years of exposure played an insignificant role in the development of the incapacitation. From a practical standpoint, it would have to be assumed that there were injuries suffered on a cellular level for the entire twenty year period and that all the discreet injuries are relevant to the incapacitation. As such, it makes great sense, in our opinion, to treat the entire process as triggering coverage.

Also essential to this analysis is the consideration of the entire process as one insurable *occurrence* and the treatment of the incapacitation as the result of an *accumulation* of the continuous discreet injuries; a point we believe is further strengthened by the clause in the policies stating: "all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence." As such, it is fair to conclude, in situations like the present one, that a part of the disease process, or injury, occurred during the effective period of *each policy,* but that the totality of the injury did not occur *solely* in any of the policies effective period. Thus, although it is fair to hold the insurer liable for all sums "which the insured shall become legally obligated to pay" because of bodily injury to which the insurance applies, it is not so as to liability for bodily injury to which the insurance did not apply; that being, that injury which occurred outside of the effective period of each policy.

If asbestos related disease is to be construed as a cumulative injury it seems difficult for us to conclude that the insurance applies to those injuries, or that portion of the liability attributable to injuries, which occur before or after the effective dates of the policy. Going back to our previ-

ous example, if an insurer insured the manufacturer for the first five years of a twenty year exposure, can we conclude that absent the claimant's additional fifteen years of exposure he would still be suffering the exact same incapacitation? The answer is, obviously, no. All twenty years of exposure, plus the periods post exposure to manifestation, must be considered equally relevant to the eventually suffered incapacitation, and therefore, it would be difficult to assume that the insurer should become completely liable for the incapacitation, logically concluded to result from a twenty year exposure to the asbestos products, when it provided coverage for only five of those years.[4]

We further believe our goal of construing the obligations under the policies should be to equate the rights gained under the several policies with the rights the insured would have gained had it been insured with only one liability insurer during the entire relevant period.[5] We see no reason that the insured could reasonably expect that by simply switching among several different liability carriers, and maintaining roughly the same amount of coverage, it could expect to expand its coverage several fold, in essence, stacking its coverage. Yet this is the result which would occur should the joint and several-seriatim approach be taken. Under that approach the first policy activated would obligate that provider with the duty to defend and indemnify until the claim was settled, or judgment satisfied, until the policy limits were exhausted, at which time the next in line insurer would be similarly obligated, and so on until the claim or the available coverage is exhausted. Under such a situation, an insured who purchased $100,000 per occurrence coverage from five different carriers would have its

4. In this regard, the fact that coverage is triggered by an event occurring during the effective period of the policy does not automatically mean that the entire liability accrues to the issuing insurer. In our opinion, the issue of trigger is separate and apart from extent of liability or obligation. We do not see the two as co-extensive.

5. Of course, this presumes that the insured basically maintained the same or similar coverage with the various insurers and that the several policies being considered do not include excess coverage situations.

coverage magically increased to $500,000 per occurrence, simply because it happened to switch carriers on four occasions subsequent to its initial purchase. We can find no reason to conclude that such an interpretation is reasonable under such a factual pattern. There would be no sound reason to treat such a manufacturer differently than the one who maintained coverage with the same insurer throughout the relevant period.

In contrast, we must disagree with the determination of the trial court regarding an appropriate treatment of the situation where there is more than one policy in effect issued by the same insurer. In such a case, and assuming that a premium has been paid for each and the absence of express provisions to the contrary, such a situation would have to be construed to activate additional coverage of that insurer so that its proportionate share of the indemnification would be subject to the limits of the various activated policies. This would be consistent with the reasonably imputed intention behind the purchase of several policies. If the insured were only able to choose indemnification under the policy having the highest limit, as directed by the trial court, it would lose the benefit of purchasing multiple policies, the intent of which must be assumed to be the expansion of available coverage; otherwise the purchase of additional coverage would have no valid purpose and the benefit apparently derived from the additional expenditure would become illusory.

Similarly untenable is the position that the insured will be completely shielded from liability simply because it was insured for a fractional period of a claimant's exposure and development of asbestos related disease; or, in other words, when it failed to purchase insurance coverage for the total period of time that the claimant was suffering asbestos related injury. This argument suggests that because coverage is triggered by any portion of the exposure to manifestation period, and because the insurer is obligated to pay "all sums" the insured is held liable for, it is inconsequential that the insured may have been uninsured for a period of

the claimant's exposure through development. This theory disregards our determination above, that asbestos related disease must be construed as a cumulative injurious process and that the insurer is only obligated to indemnify the insured for liability resulting from bodily injury *to which the insurance applies.* That being, the injuries incurred while the policy was in effect.

If the asserted theory was given validity an insured could become completely indemnified for a number of suits if it had simply bought insurance for a brief period common to all the suits. We cannot conclude that a reasonably objective manufacturer could expect that it would be completely covered for incapacitation occurring as a result of lengthy exposure to its products when it purchased coverage for only a brief period of time. Under such a theory, the bulk of the injuries suffered, upon which liability is based, would have occurred during periods of time in which no coverage was purchased. This hardly appears to be a reasonable expectation to us.

■ In light of the above stated rationale, the answers to the questions raised above become obvious. First, a reasonable interpretation of the policies in the context of asbestos related injuries dictates that proration be adopted. Only then can the insurer be held liable for that portion of the liability claim for which it offered insurance protection for, and for which it collected a premium.

Consistent with this approach we conclude that each insurer shall be obligated to pay a portion of the indemnification and liability costs consistent with the proportionate share of time its policy was in effect during the claimant's period of exposure to manifestation of the asbestos related disease. Logic further dictates that any deductible and/or occurrence limits be reduced by the same proportion. The aggregate effect should spread the risk to conform with that assumed by the insurers and deferred by the insured, thus effectuating the contractual relationship entered into by the parties.

■    Second, for any periods of time in which France operated without products liability coverage it must be considered uninsured and thus, liability imposed for that portion of the injury sustained during the uninsured period will not be indemnified.[6]  We note that our decision in this regard is essentially the same as that reached by Sixth Circuit Court of Appeals in *INA v. Forty-eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980).

■    Lastly, we consider France's contention that it is entitled to attorney's fees for the bad faith refusal of an obligation to indemnify and defend.  We, as the trial court below, have difficulty concluding that there was any element of bad faith involved in the refusal.  The various conflicting decisions in the several jurisdictions which have considered the issue before us and the fact that, clearly, reasonable minds can differ as to an appropriate determination of this issue, leads us to conclude that there was reasonable basis in the refusal.  Thus, we affirm the trial court as to this matter.

## CONCLUSION:

In conclusion, we find that the entire asbestos disease process from first exposure to manifestation constitutes an

6. Consistent with this finding, we must reject France's argument that it was covered for products liability under the pre–1973 PMA policies. Although perhaps the scheme of the PMA policy in setting forth the differing form of coverages available was not as clear as it possibly could have been, neither was it ambiguous.  The schedule of coverage under the PMA policies states that the insurance provided "is only with respect to such of the following Coverages as are indicated by specific premium charge or charges."  The schedule includes several categories including "premises," "elevators," "independent contractors," "completed operations" and "products."  There is no indication in these schedules that a premium was being charged for products coverage.  Consequently, in light of the above prefatory clause, there should have been no expectation that products coverage was being provided.  Further, the "products" section directs attention to the exclusion endorsement which indicates that the bodily injury liability coverage did not apply to bodily injury included within the completed operations and products hazard.  Thus, we cannot conclude that the exclusion is ambiguous, and France has failed to establish grounds that would compel the disregarding of the exclusion.  Furthermore, it has been established that no premium was charged for this coverage during the periods in question.

event triggering coverage of an insurer's obligation under a comprehensive general liability insurance policy that covers products liability. We further find that the most reasonable way to treat the disease/incapacitation is as one resulting from, and essentially comprised of, a series of discreet cellular injuries to the lungs.

The most reasonable approach to the question of obligation of insurers, when more than one have provided coverage during the relevant period, is that each insurer is responsible for the liability imposed upon the insured attributable to the injuries sustained while its policy was in effect, and that each part of the disease process must be considered equally relevant in determining this obligation. Thus, proration, consistent with the amount of time insurance was provided to the insured, evolves as the most reasonable approach to determining the liability of the different insurers. This conclusion necessarily results in the additional determination that the insured will be responsible for the costs associated with the period of time it did not maintain liability coverage. Further, we conclude that there was a reasonable contest and refusal of defense, as such no attorney fees will be awarded.

For the foregoing reasons, we affirm the order appealed from as to its determination of trigger of coverage, and its denial of attorney's fees, and reverse as to its determination of the various obligations of the insurers relevant to their provision of coverage. In this regard, those obligations will be as so stated in this opinion.

Order affirmed in part, and reversed in part. Jurisdiction relinquished.

CAVANAUGH and MONTEMURO, JJ., concur in the result.