626 A.2d 502

J.H. FRANCE REFRACTORIES COMPANY and
the Van Brunt Company, Appellants,

v.

ALLSTATE INSURANCE COMPANY, PMA Insurance Company,
St. Paul Insurance Company, U.S. Fire Insurance Company,
Wausau Insurance Company and Rockwood Insurance Company, Appellees.

ALLSTATE INSURANCE COMPANY, Appellee,

v.

J.H. FRANCE REFRACTORIES COMPANY, Appellant.

Pennsylvania Manufacturers Insurance Company, St. Paul Fire
Insurance Company, U.S. Fire Insurance Company, Wausau
Insurance Company and Rockwood Insurance Company, Appellees.

Supreme Court of Pennsylvania.

Argued April 7, 1992.

Decided May 27, 1993.

30

Mark D. Turetsky and Lisa D. Stern, Norristown, for appellants.

Robert F. Pugliese, Pittsburgh, for amicus, Westinghouse Elec. Corp.

Donald E. Seymour, Peter J. Kalis, David J. Strasser and Thomas Reiter, Pittsburgh, for amicus, Dresser Industries, Inc. and Westinghouse Elec. Corp.

James J. Restivo, Jr., Douglas E. Cameron, and Kathy L. Cerminara, Pittsburgh, for amicus, Pittsburgh Corning, Corp.

John A. Murphy, Philadelphia, and Dennis M. Flannery, Washington, DC, for amicus, Ins. Co. of North America.

Daniel S. Coval, Jr., David T. Scott and Ralph L. Hose, Ardmore, for St. Paul Ins. Co.

Martin Mullen, Philadelphia, for Employees of Wausau Ins. Co.

John C. Sullivan, Philadelphia, for Allstate Ins. Co.

Allan C. Molotsky, Philadelphia, for Wausau Ins. Co.

Francis T. McDevitt, Philadelphia, for Rockville Ins. Co.

Lee M. Epstein, Philadelphia, for amicus, Keene Corp., Colt Industries and Mid-America Legal Foundation.

Arthur S. Olick, pro hoc vice, New York City, for Keene Corp.

Robert L. Pratter, Philadelphia, for PMA Ins. Co.

Daniel J. Doyle, Deputy Atty. Gen., Harrisburg, Robert N. Saylor and William P. Skinner, Washington, DC, for amicus, Armstrong World Industries, Inc.

Louis C. Long, Pittsburgh, and Robert J. Kelly, New York City, for U.S. Fire Ins. Co.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This case was before us in 1989 to determine the jurisdiction of the trial court when it was alleged that all indispensable parties were not joined in the action. Our opinion in that appeal is helpful in understanding the background of the case.

The factual background of the case is that J.H. France Refractories Company (hereinafter J.H. France) and its now wholly-owned subsidiary, the Van Brunt Company, between 1956 and 1972 manufactured and marketed a product containing asbestos. J.H. France also marketed and continues to market products containing silica, which, like asbestos, is

claimed to cause physical injury to those who breathe it. On April 19, 1979, Gladys Temple, administratrix of the estate of Charles Temple, filed suit against J.H. France, claiming that her decedent, Charles Temple, suffered from asbestos-related diseases contracted through exposure to J.H. France's asbestos-containing products from 1948 through 1978.

J.H. France was insured during various time periods relevant to this action by the Pennsylvania Manufacturers Association, St. Paul, Allstate, U.S. Fire, Wausau, and Rockwood Insurance Companies. Upon receipt of this suit, J.H. France presented the Temple claim to Allstate, St. Paul and PMA for defense and indemnity, the insurers who had provided coverage between 1967 and 1979. None of these insurers agreed to defend or indemnify, and J.H. France undertook its own defense. In 1981 J.H. France filed this declaratory judgment action for the purpose of determining the insurers' duty to defend and indemnify against the Temple claim. Subsequent to the filing of this declaratory judgment action, additional asbestos and silica-related lawsuits were filed against J.H. France. Apparently because these actions were for injuries allegedly sustained during a time period which went beyond 1979 (into the 1980's), additional insurance companies became involved. In 1984, Allstate filed its own declaratory judgment action, naming PMA, St. Paul, U.S. Fire, Wausau and Rockwood Insurance Companies, as well as fourteen individuals who had filed asbestos or silica-related lawsuits after J.H. France filed its original declaratory judgment action. Still other asbestos or silica-related claims against J.H. France were filed after Allstate's declaratory judgment actions were consolidated, and the carriers who insured J.H. France during the relevant time periods have taken differing positions with respect to their duty to indemnify and defend. If a defense has been provided, it has been provided subject to reservation of rights.

The issues at trial were whether the various insurance companies were liable for the defense and indemnification of

J.H. France for claims based on exposure to its products containing asbestos and silica, and if they were liable, how the liability was to be apportioned among the insurers. The various insurance contracts could be adjudicated in one action because the relevant language was virtually identical in all of the contracts. The trial court ... worked out a scheme ... in which the various insurers were required to defend and indemnify against asbestos or silica related claims made against J.H. France and determined that the insurers had not acted in bad faith in failing to defend or indemnify at an earlier time.

Multiple appeals were filed in Superior Court challenging the substance of the trial court's determination, but Superior Court declined to address the merits of the case on the grounds that the lower court did not have jurisdiction because parties who filed claims against J.H. France after the declaratory judgment actions were filed had not been included in the declaratory judgment action.

*J.H. France Refractories Co. v. Allstate Insurance Co.*, 521 Pa. 91, 93–95, 555 A.2d 797, 798–99 (1989). The first appeal resulted in a decision that the declaratory judgment action was proper despite the nonjoinder of parties who filed claims after the initiation of this proceeding, and the case was remanded for the Superior Court to review the substantive aspects of the appeal. *Id.* The review having been accomplished, we have allowed the appeal of J.H. France which challenges several aspects of the Superior Court's disposition of the case, 396 Pa.Super. 185, 578 A.2d 468.

Some additional facts are necessary to resolve the detailed issues under review. The six insurers which are parties to this action provided comprehensive liability insurance coverage to J.H. France at all times relevant to this action.[1] All the

1. The periods of coverage are as follows:

| | | |
|---|---|---|
| PMA | July 1, 1967 | — July 1, 1976 |
| St. Paul | July 1, 1976 | — July 1, 1977 |
| Allstate | July 1, 1977 | — July 1, 1979 |
| U.S. Fire | July 1, 1979 | — June 3, 1980 |
| Wausau | June 3, 1980 | — October 30, 1983 |
| Rockwood | October 30, 1983 | — October 30, 1984 |

policies contained identical language insofar as the relevant clauses are concerned:

[The Insurer] will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury ... to which this insurance applies, caused by an occurrence, and [the Insurer] shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury....

"Bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom....

"Occurrence" means an accident, including continuous or repeated exposure to conditions, which result in bodily injury ... neither expected nor intended from the standpoint of the Insured.

Pursuant to the stipulation of all parties, the medical evidence at trial included the testimony of Dr. John E. Craighead, an anatomical and clinical pathologist who is an expert in pneumoconiosis and asbestos-related disease. In summary, he testified that "injury" is a "process which alters structure," and the term is applicable in reference to a cell, a tissue, an organ, or the entire body. "Disease" means "an injury and a response to that injury." The presence of asbestos in the lungs stimulates a wide range of reactions, which Dr. Craighead divides into three responses.

First, characterized as "direct injury," asbestos fibers in the respiratory tract interact with the membranes of the cells lining the trachea and cause the release of enzymes and superoxides which either damage or kill individual cells. If sufficient cells are damaged, tissue (an accumulation of cells) is damaged or destroyed. This injury occurs within minutes after asbestos fibers enter the cells.

Second, characterized as "indirect injury," the presence of asbestos fibers stimulates macrophages to accumulate. Macrophages are scavenger cells which attempt to envelope foreign particles. As microphages attempt to ingest the fi-

bers, there is a release of enzymes which have a damaging effect on tissue. There is also a chemical reaction which scars the injured tissue. The accumulation of scar tissue in the respiratory system prevents the lung from performing its normal oxygen-carbon dioxide gas exchange. The process of macrophage accumulation, tissue scarring, and functional impairment of the lungs begins to occur within a month of exposure.

The third response in the asbestosis process is a change in the form of the cells lining the bronchial tree. The normal lining, designed to move dust particles out of the body, is replaced by cells lacking cilia, resulting in a tendency toward accumulation of asbestos particles.

The asbestosis process continues to progress even after exposure to asbestos ceases. Medical authorities differ on the reasons for this fact. Substantial authority regards this as the nature of the asbestosis pathogenesis. Another view theorizes that disease progression may be attributable to the eventual, and inevitable, decrease in the respiratory function involved in aging, and also to other factors such as cigarette smoking or infection. In either view, the injury process continues after exposure and may culminate in "manifestation," such severe functional impairment that asbestosis is finally diagnosed, and of course, the disease may be fatal.

Based on the foregoing record, the Superior Court held that liability of each insurer was triggered if any one of the three—exposure, progression, or manifestation—occurred during the term of its policy. The court prorated the obligations of all insurers whose policies were in effect throughout the development of the disease, including J.H. France as a self-insurer during periods when it did not purchase liability insurance. Although the Superior Court did not explicate this point, it seems implicit in its reasoning that the obligations to defend would be allocated pro rata in the same way as the obligations to indemnify; presumably J.H. France would bear a proportionate share of defense costs for periods when it did not purchase liability insurance. Finally, the Superior Court affirmed the trial court's ruling that the insurers were not guilty

of bad faith in contesting their duty to defend so that J.H. France was not entitled to attorneys fees in this declaratory judgment action.

■ The first issue is whether the Superior Court was correct in applying the "multiple-trigger" theory of determining liability of the insurers—that is, in deciding that liability results if *any one of the following occurred during the time an insurer was on the risk:* exposure to asbestos or silica, progression of the pathology, or manifestation of the disease. The Superior Court concluded that the medical evidence of discrete cellular injuries occurring upon exposure to asbestos justifies the conclusion that exposure to asbestos causes immediate "bodily injury" in the terms of the insurance policies, triggering the insurers' duty to indemnify. With this analysis and conclusion, we agree. In similar fashion, the Superior Court reached the conclusion that the term "bodily injury" also encompasses the progression of the disease throughout and after the period of exposure until, ultimately, the manifestation of recognizable incapacitation constitutes the final "injury," and that these stages in the pathogenesis of asbestos- and silica-related diseases also trigger the liability of J.H. France's insurance carriers. We find no error in this analysis and conclusion. The insurance policy language and the evidence of the etiology and pathogenesis of asbestos-related disease compel us to reach this result.

The insurance policies obligate the insurers to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury . . . to which this insurance applies, caused by an occurrence." Whether the claimants' diseases are "bodily injury to which this insurance applies" depends on the definition of bodily injury. The policies define bodily injury as "bodily injury, sickness or disease which occurs during the policy period." The injuries at issue are caused by an "occurrence," which the policies define as "an accident, *including continuous or repeated exposure to conditions,* which result in bodily injury . . . neither expected nor intended" by the insured. The medical evidence in this case unequivocally establishes that

injuries occur during the development of asbestosis immediately upon exposure, and that the injuries continue to occur even after exposure ends during the progression of the disease right up until the time that increasing incapacitation results in manifestation as a recognizable disease. If any of these phases of the pathogenesis occurs during the policy period, the insurer is obligated to indemnify J.H. France under the terms of the policy.

Abundant authority supports this result. In the surfeit of litigation spawned by asbestos-related disease, many courts have recognized that mere exposure to asbestos causes injury within the meaning of the same policy language which controls this case. *See, e.g., Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980), *clarified*, 657 F.2d 814, *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Other courts have recognized that manifestation, likewise, constitutes an injury which triggers the insurers' obligation to indemnify. *See, e.g., Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 682 F.2d 12 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983). Rather than selecting one or another of the phases as the exclusive trigger of liability, it seems more accurate to regard all stages of the disease process as bodily injury sufficient to trigger the insurers' obligation to indemnify, as all phases independently meet the policy definition of bodily injury. This multiple-trigger approach, as well, has been adopted by other courts. *See, e.g., Vale Chemical Co. v. Hartford Accident and Indemnity Co.*, 340 Pa.Super. 510, 490 A.2d 896 (1985), *rev'd on other grounds*, 512 Pa. 290, 516 A.2d 684 (1986); *AC and S, Inc. v. Aetna Casualty and Surety Co.*, 764 F.2d 968 (3d Cir.1985); *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). We therefore affirm the Superior Court's approval of the so-called multiple-trigger theory of liability adopted by the trial court.

■  Thus, every insurer which was on the risk at any time during the development of a claimant's asbestos-related disease has an obligation to indemnify J.H. France. The second question is how to allocate the liability of each insurer when, as is commonly the case, more than one insurer was on the risk at one time or another during the development of a claimant's disease.

As we have intimated above, the Superior Court adopted a scheme whereby the several insurers on the risk during a given claimant's development of a disease would share the obligation to indemnify on a pro rata basis apportioned upon the amount of time each policy was in effect, including an obligation of J.H. France to act as a self-insurer during periods when it was uninsured. There are several reasons we decline to adopt this approach.

First, and most compelling, is the language of the policies themselves. Each insurer obligated itself to "pay on behalf of the Insured *all sums* which the Insured shall become legally obligated to pay as damages because of bodily injury to which this insurance applies." We have already ascertained that any stage of the development of a claimant's disease constitutes an injury "to which this insurance applies" under each policy in effect during any part of the development of the disease. Under any given policy, the insurer contracted to pay *all sums* which the insured becomes legally obligated to pay, not merely some pro rata portion thereof. As another court stated,

> each policy has a built-in trigger of coverage. Once triggered, each policy covers [the manufacturer's] liability. There is *nothing* in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period. As we interpret the policies, they cover [the manufacturer's] entire liability once they are triggered.

*Keene, supra,* 667 F.2d at 1048. (Emphasis in original.)

Second, there is no medical evidence in this case to substantiate the assumption that the progression of asbestos-related disease is linear in character. There is, instead, good reason

to believe otherwise. *See INA v. Forty–Eight Insulations, Inc., supra,* 633 F.2d at 1214. To apportion liability among the insurers on a strictly temporal basis in direct proportion to the length of time each insurer was on the risk, however, notwithstanding its surface attractiveness, assumes a linearity of disease progression which this record does not support.

Third, although it is superficially attractive to include J.H. France in the pro rata apportionment of liability for periods during which it was uninsured, to do so is to create a judicial fiction which cannot be supported, viz., that J.H. France was self-insured under a policy the terms of which are ascertainable so that J.H. France may be included among the insurers in apportionment of liability. Faced with the same argument, the United States Court of Appeals for the District of Columbia Circuit stated:

> We have no authority upon which to pretend that [the manufacturer] also has a "self-insurance" policy that is triggered for periods in which no other policy was purchased. Even if we had the authority, what would we pretend that the policy provides? What would its limits be? There are no self-insurance policies, and we respectfully submit that the contracts before us do not support judicial creation of such additional insurance policies.

*Keene, supra,* 667 F.2d at 1048–49.

Fourth, the definition of an "occurrence" which constitutes a risk against which the insurance was provided leads us to reject the pro rata allocation ordered by the Superior Court. The definition suggests that any insurance policy triggered under the "multiple-trigger" concept with respect to any specific claim is potentially liable for the entire amount of any judgment or settlement of that claim. An "occurrence" includes "continuous or repeated exposure to conditions which result in bodily injury." The insurers which drafted the definition obviously contemplated the possibility of injury resulting from continuous or repeated exposure to conditions, and specified that the process of exposure was to constitute one occurrence. If prolonged exposure, constituting one occurrence, resulted in injury, and if the injury occurred during

the time a given policy was in effect, then the injury is an insurable risk under the terms of that policy. Being defined as one "occurrence," the entire injury, and all damages resulting therefrom, fall within the indemnification obligation of the insurer. In other words, once the liability of a given insurer is triggered, it is irrelevant that additional exposure or injury occurred at times other than when the insurer was on the risk. The insurer in question must bear potential liability for the entire claim.

■ In keeping with this analysis, we conclude that each insurer which was on the risk during the development of an asbestosis-related disease is a primary insurer. In order to accord J.H. France the coverage promised by the insurance policies, J.H. France should be free to select the policy or policies under which it is to be indemnified.

This analysis was also used in *Keene, supra,* to implement the multiple-trigger approach to liability. The court stated:

> In any suit against Keene for an asbestos-related disease, it is likely that the coverage of more than one insurer will be triggered. Because each insurer is fully liable, and because Keene cannot collect more than it owes in damages, the issue of dividing insurance obligations arises. The only logical resolution of this issue is for Keene to be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury. That is the only way that Keene can be assured the security that it purchased with each policy. Our holding each insurer fully liable to Keene is also consistent with other courts' allocation of liability when more than one insurer covers an indivisible loss.

> This does not mean that a single insurer will be saddled with full liability for any injury. When more than one policy applies to a loss, the "other insurance" provisions of

each policy provide a scheme by which the insurers' liability is to be apportioned.

*Keene,* 667 F.2d at 1050 (citation omitted).

When the policy limits of a given insurer are exhausted, J.H. France is entitled to seek indemnification from any of the remaining insurers which was on the risk during the development of the disease. Any policy in effect during the period from exposure through manifestation must indemnify the insured until its coverage is exhausted. We believe this resolution of the allocation of liability issue to be most consistent with the multiple-trigger theory of liability.

This conclusion does not alter the rules of contribution or the provisions of "other insurance" clauses in the applicable policies. There is no bar against an insurer obtaining a share of indemnification or defense costs from other insurers under "other insurance" clauses or under the equitable doctrine of contribution.

■ The third issue is whether the Superior Court was correct in determining that the insurance coverage provided by PMA prior to November 13, 1973 had a valid exclusion pertaining to asbestos-related disease claims. J.H. France argues that the exclusion set forth in the policies is ambiguous and therefore invalid. PMA argues that the exclusion was bargained for, is perfectly clear, is binding, and that J.H. France was therefore uninsured against asbestosis claims prior to November 13, 1973.

The policy, in endorsement number one, states:

EXCLUSION (Completed Operations Hazard and Products Hazard)

It is agreed that such insurance as is afforded by the Bodily Injury Liability Coverage and the Property Damage Liability Coverage does not apply to bodily injury or property damage included within the Completed Operations Hazard or the Products Hazard.

"Products hazard" is defined as follows:

"products hazard" includes bodily injury and property damage arising out of the named insured's products or

reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.

The claims at issue in the litigation underlying this case are squarely within the risk designated as "products hazard." We see no ambiguity in the exclusion of insurance against "products hazard," and thus cannot accept J.H. France's invitation to construe a nonexistent ambiguity against the insurer.

Moreover, all of the annual policies issued prior to November 13, 1973 declare that the insurance "is only with respect to such of the following coverages as are indicated by specific premium charge or charges." The schedule of coverage includes several categories, including "products." In the description of the hazard insured under products, the entry "see exclusion endorsement attached" appears, and the space for the premium charge is blank. On November 13, 1973, an endorsement was added to the policy then in effect which described the product hazard insured against as "brick manufacturing" and indicates the amount of the premium charged for the products hazard coverage. It is clear that PMA did not begin insuring J.H. France against claims based on asbestos-related disease until November 13, 1973, when the products hazard exclusion was removed by endorsement and a premium was first charged for products hazard coverage.

■ The fourth issue is how to allocate the insurers' duty to defend when liability under more than one policy is triggered with regard to a claim based on asbestos-related disease. The obligation to defend is based on the policies which state that "the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury ... [until] the applicable limit of the company's liability has been exhausted by payment of judgments or settlements." It is well established that the duty to defend and to pay the costs of defense is broader than the duty to indemnify. *Erie*

*Insurance Exchange v. Transamerica Insurance Co.,* 516 Pa. 574, 533 A.2d 1363 (1987).

■ The defense of a claim is a right, as well as a duty, falling upon the insurer. In order to effectuate that right, we hold that the selection of the insurer or insurers to undertake a defense is to be made by the insurers. In the event that the insurers are unable to agree as to the conduct of the defense, then J.H. France shall be entitled to select an insurer.

■ The last issue is whether the trial court and the Superior Court erred in denying J.H. France's claim for attorneys fees and expenses based on alleged bad faith manifested by the insurance companies in refusing to defend the asbestosis cases. Like the courts below, we cannot impute to the insurers any bad faith in contesting their obligations to defend and indemnify the asbestos-related claims represented by *Temple* when excessive pluralism and disparity exists in the decisions of the many courts which have entertained similar litigation. There are a variety of approaches and possible conclusions to the several issues raised in this case, any of which seems reasonable from some point of view. Most of the different approaches, points of view, and conclusions are represented among the many parties in this case and the two courts below, as well as in the decisions of courts in many other jurisdictions. We do not regard the issues presented in this case as simple ones, nor are the principles underlying our decision obvious. It would be harsh indeed to attribute bad faith to parties which relied on the reasoning and approaches that other courts have found convincing, when there had been no definitive precedent in this jurisdiction. Therefore, J.H. France is not entitled to attorneys fees or costs in this case.

The order of the Superior Court is reversed insofar as it is inconsistent with this opinion. Reversed in part and affirmed in part.

## ORDER

AND NOW, this 27th day of May, 1993, it is hereby ordered that the Petitions to Strike Statement of Issues, filed by

appellant, are hereby denied; it is further ordered that the Application to Add or Substitute as an Appellee the Pennsylvania Insurance Guaranty Association, filed by appellant, is hereby denied.

LARSEN, J., did not participate in the consideration or decision of this case.

McDERMOTT, J., did not participate in the decision of this case.