# The North River Insurance Co. v. Mine Safety Appliances Co.

*Alan S. Miller, Henry M. Sneath, Bridget M. Gillespie* and *Dennis O. Brown*, for plaintiff.

*George L. Stewart, II, Brian T. Himmel, Michael H. Sampson,* and *Robert Nicholas*, for defendant Mine Safety Appliances Co.

*Louis C. Long* and *Stefano Calogero*, for defendant Allstate Insurance Co.

WETTICK, *J.*, February 13, 2014—The subject of this opinion and order of court is Mine Safety Appliances Company's ("MSA") motion for partial summary judgment concerning trigger of coverage for mesothelioma and asbestos-related lung-cancer claims. MSA seeks a ruling that "the continuous trigger adopted in *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993), determines which insurance policy(ies) apply to bodily injury claims (including death resulting therefrom) involving, or allegedly involving, mesothelioma or asbestos-related lung cancer arising out of exposure to asbestos."

The North River Insurance Company ("North River") contends that the continuous-trigger approach adopted in *J.H. France* is based on science describing the disease process that has now been rejected by the scientific community studying asbestos. Thus, *J.H. France* is no longer good law.

There is no Pennsylvania case law that has addressed this issue.

## Background

Since at least the 1980s, MSA has been sued in numerous personal injury lawsuits in jurisdictions across the United States, in these lawsuits, the plaintiffs allege that they developed mesothelioma or asbestos-related lung cancer from exposure to MSA products containing asbestos.

There are three North River policies from which MSA seeks coverage for cancer claims arising out of exposure to asbestos: the earliest policy covers the period from April 1, 1980 to April 1, 1981; the second policy covers the period from April 1, 1981 to April 1, 1982; and the third policy covers the period from April 1, 1982 to April 1, 1983. Each policy is a comprehensive CGL insurance policy which provides that the insurer will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages on account of "personal injuries." "Personal injuries" means bodily injury, sickness, or disease caused by an occurrence during the policy period. An "occurrence" means an accident, including continuous or repeated exposure to conditions, which results in personal injury.

Under the policy language described above, the North River policies provide coverage only for personal injuries during the policy period. Thus, the dispute raised by MSA's motion for partial summary judgment is over when an injury, a sickness, and/or a disease is deemed to have occurred.[1]

In asbestos cases, there is not an obvious answer as to when an injury, sickness, or disease occurs because several

---

1. "The relevant terms in the North River policies are substantially similar to those in the *J.H. France's* carriers.

decades may pass between the initial exposure to asbestos and the development of a detectable disease.

In asbestos litigation, insurers and insureds have proposed different interpretations. These include the following:

Construction 1: Only the policies in effect on the date the claimant's disease first manifests itself provide coverage.

Construction 2: Every policy in effect at any time the claimant was exposed to asbestos provides coverage; there is no coverage after the claimant was no longer exposed to asbestos.[2]

Construction 3: Every policy that provides coverage at any time from the date of the initial exposure to the date of manifestation covers the entire claim.[3]

Construction 4: Same as constructions 2 and 3 with the following modification: Each insurer is required to pay only a *pro rata* share of the insured's liability to be determined by the duration of a claimant's exposure to the insured's products during the policy periods in relation to the entire duration of the claimant's exposure to the insured's product.

J. H. France

In *J.H. France*, six insurance companies provided coverage between 1967 and 1979. Personal injury claims were brought against J.H. France by persons exposed to J.H. France's products containing asbestos. Each of the

---

2. Construction 2 might, instead, use the date of the exposure that began the progression of the disease.

3. Construction 3 might, instead, use the date of the exposure that began the progression of the disease.

insurance companies refused to provide a defense or to indemnify J.H. France.

J.H. France instituted an action for declaratory relief to determine which of the various insurance companies were liable for the defense and indemnification and, if liable, how the liability was to be apportioned among the insurers.

The relevant language in the insurance policies reads as follows:

> [The Insurer] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury...to which this insurance applies, caused by an occurrence, and [the insurer] shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury....
>
> "Bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom....
>
> "Occurrence" means an accident, including continuous or repeated exposure to conditions, which result in bodily injury...neither expected nor intended from the standpoint of the insured.

*J.H. France*, 626 A.2d at 505.

Pursuant to a stipulation of the parties, the medical evidence at trial included the following:

> Pursuant to the stipulation of all parties, the medical evidence at trial included the testimony of Dr. John E. Craighead, an anatomical and clinical pathologist

who is an expert in pneumoconiosis and asbestos-related disease, in summary, he testified that "injury" is a "process which alters structure," and the term is applicable in reference to a cell, a tissue, an organ, or the entire body. "Disease" means "an injury and a response to that injury." The presence of asbestos in the lungs stimulates a wide range of reactions, which Dr. Craighead divides into three responses.

First, characterized as "direct injury," asbestos fibers in the respiratory tract interact with the membranes of the cells lining the trachea and cause the release of enzymes and superoxides which either damage or kill individual cells. If sufficient cells are damaged, tissue (an accumulation of cells) is damaged or destroyed. This injury occurs within minutes after asbestos fibers enter the cells.

Second, characterized as "indirect injury," the presence of asbestos fibers stimulates macrophages to accumulate. Macrophages are scavenger cells which attempt to envelope foreign particles. As microphages attempt to ingest the fibers, there is a release of enzymes which have a damaging effect on tissue. There is also a chemical reaction which scars the injured tissue. The accumulation of scar tissue in the respiratory system prevents the lung from performing its normal oxygen-carbon dioxide gas exchange. The process of macrophage accumulation, tissue scarring, and functional impairment of the lungs begins to occur within a month of exposure.

The third response in the asbestosis process is a change in the form of the cells lining the bronchial tree. The normal lining, designed to move dust particles out of the body, is replaced by cells lacking cilia, resulting in

a tendency toward accumulation of asbestos particles.

The asbestosis process continues to progress even after exposure to asbestos ceases. Medical authorities differ on the reasons for this fact. Substantial authority regards this as the nature of the asbestosis pathogenesis. Another view theorizes that disease progression may be attributable to the eventual, and inevitable, decrease in the respiratory function involved in aging, and also to other factors such as cigarette smoking or infection. In either view, the injury process continues after exposure and may culminate in "manifestation," such severe functional impairment that asbestosis is finally diagnosed, and of course, the disease may be fatal.

*Id.* at 505-06.

The initial issue that the Supreme Court addressed in its *J.H. France* opinion was whether the Pennsylvania Superior Court was correct in applying a multiple-trigger interpretation under which an insurer is obligated to pay the entire claim if its policy covers any period from the date of exposure to the date of manifestation. As to exposure, the Pennsylvania Supreme Court ruled that the Pennsylvania Superior Court correctly concluded that:

the medical evidence of discrete cellular injuries occurring upon exposure to asbestos justifies the conclusion that exposure to asbestos causes immediate "bodily injury" in the terms of the insurance policies, triggering the insurers' duty to indemnify.

*Id.* at 506.

As to progression and manifestation of the disease, the Pennsylvania Supreme Court stated that "[t]he insurance policy language and the *evidence of the etiology and pathogenesis of asbestos-related disease* compel us to

reach . . ." the result reached by the Pennsylvania Superior Court that "the term 'bodily injury' also encompasses the progression of the disease throughout and after the period of exposure until, ultimately, the manifestation of recognizable incapacitation constitutes the final Injury,' and that these *stages in the pathogenesis of asbestos- and silica-related diseases* also trigger the liability of J.H. France's insurance carriers." *Id.* (emphasis added).

The Supreme Court offered the following explanation for its ruling that a policy period for asbestos-related cancer extends from the date of initial exposure to manifestation of the disease:

> The insurance policies obligate the insurers to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... to which this insurance applies, caused by an occurrence." Whether the claimants' diseases are "bodily injury to which this insurance applies" depends on the definition of bodily injury. The policies define bodily injury as "bodily injury, sickness or disease which occurs during the policy period." The injuries at issue are caused by an "occurrence," which the policies define as "an accident, *including continuous or repeated exposure to conditions,* which result in bodily injury.... neither expected nor intended" by the insured. The medical evidence in this case unequivocally establishes that injuries occur during the development of asbestosis immediately upon exposure, and that the injuries continue to occur even after exposure ends during the progression of the disease right up until the time that increasing incapacitation results in manifestation as a recognizable disease. If any of these phases of the pathogenesis occurs during the policy period, the insurer is obligated to indemnify J.H. France under the

terms of the policy.

Abundant authority supports this result. In the surfeit of litigation spawned by asbestos-related disease, many courts have recognized that mere exposure to asbestos causes injury within the meaning of the same policy language which controls this case. *See, e.g., Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.), *cert. denied*, 454 U.S. 1109, 102 S. Ct. 686, 70 L.Ed.2d 650 (1981); *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980), *clarified*, 657 F.2d 814, *cert. denied*, 454 U.S. 1109, 102 S. Ct. 686, 70 L.Ed.2d 650 (1981). Other courts have recognized that manifestation, likewise, constitutes an injury which triggers the insurers' obligation to indemnify. *See, e.g., Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 682 F.2d 12 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S. Ct. 1280, 75 LEd.2d 500 (1983). Rather than selecting one or another of the phases as the exclusive trigger of liability, it seems more accurate to regard all stages of the disease process as bodily injury sufficient to trigger the insurers' obligation to indemnify, as all phases independently meet the policy definition of bodily injury. This multiple-trigger approach, as well, has been adopted by other courts. *See, e.g., Vale Chemical Co. v. Hartford Accident and Indemnity Co.*, 340 Pa. Super. 510, 490 A.2d 896 (1985), *rev'd on other grounds*, 512 Pa. 290, 516 A.2d 684 (1986); *AC and S, Inc. v. Aetna Casualty and Surety Co.*, 764 F.2d 968 (3d Cir.1985); *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). We therefore affirm the Superior Court's approval of the so-called multiple-trigger theory of liability adopted by the trial

court.

Thus, every insurer which was on the risk at any time *during the development of a claimant's asbestos-related disease* has an obligation to indemnify J.H. France.

*Id.* at 506-07 (emphasis added).

The next issue that the Supreme Court addressed in its *J.H. France* opinion was how to allocate the liability of each insurer when, as is commonly the case, more than one insurer is on the risk at one time or another during the period from initial exposure to manifestation. The Supreme Court rejected the Superior Court's scheme whereby the several insurers on the risk during the development of the disease would share the obligation to indemnify on a *pro rata* basis based on the amount of time each policy was in effect. Instead, the Supreme Court concluded that each insurer which was on the risk during the development of an asbestos-related disease is a primary insurer. Thus, *J.H. France* is free to select the policy or policies under which it is to be indemnified. *Id.* at 508.

The court concluded that this approach was supported by the language of the policies which provide that each insurer obligated itself to "pay on behalf of the insured *all sums* which the Insured shall become legally obligated to pay as damages because of bodily injury to which this insurance applies." *Id.* at 507.

The court also looked to the definition of an "occurrence" which constitutes a risk against which the insurance was provided. According to the court, this definition suggests that any insurance policy triggered under the multiple-trigger approach with respect to any specific claim is potentially liable for the entire amount of any judgment or settlement since the entire injury from

exposure to manifestation is defined as one occurrence, meaning that all damages resulting therefrom fall within the indemnification obligation of the insurer. *Id.* at 508.

Position of MSA

The relevant facts in this case are almost identical to the relevant facts in *J.H. France*. There is no Pennsylvania appellate court case law that has questioned the rulings in *J.H. France*. Thus, I should grant MSA's motion seeking a ruling that the continuous-trigger approach adopted in *J.H. France* determines what insurance policies apply to bodily injury claims involving mesothelioma or asbestos-related lung cancer.

Position of North River

In seeking a ruling denying MSA's motion that the continuous-trigger approach applied in *J.H. France* controls this litigation, North River agrees with MSA that the law has not changed since *J.H. France*. However, North River contends that what scientists who study asbestos now know about the progression from exposure to mesothelioma or asbestos-related lung cancer has changed.

In *J.H. France*, pursuant to a stipulation of the parties, the medical evidence included the opinion of Dr. John E. Craighead who, according to the *J.H. France* opinion, opined that the disease process begins with the initial inhalation from the initial exposure to asbestos. Consequently, insurance coverage begins at the date of the initial exposure.[4]

---

4. The dates of the initial exposure to asbestos and the date of manifestation are readily obtainable facts. Thus, it is easy to establish coverage by applying this continuous-trigger approach that begins with the initial exposure.

North River, relying primarily on the expert testimony of Dr. Thomas Sporn (North River's expert)[5] states that the scientists studying asbestos now know that the initial inhalation of the initial exposure to asbestos almost never starts the progression. Thus, the date of the initial exposure is not the date of the exposure that begins the disease process and, therefore, cannot be used as the date of bodily injury under the insurance policies. Furthermore, scientists cannot pinpoint the date of the cancer-causing exposure that began the process.[6] In his testimony, Dr. Sporn opines that the disease process for mesothelioma or asbestos-related lung cancer begins with the inhalation of asbestos (T. 119), but the initial inhalation seldom starts the process. Most inhalations of asbestos are transient, meaning that they are eliminated by the body (T. 15).

Dr. Sporn stated that everyone living in an industrialized society inhales asbestos daily and that normally the asbestos fibers are cleaned by the body's defense mechanisms at the time they are inhaled. Report of Dr. Sporn, at 6. Dr. Sporn also testified that there is a threshold dose of asbestos below which the disease process does not commence (T. 4). As long as the fiber burdens remain below the threshold, the body's defense mechanisms are sufficient to prevent the start of the process (T. 7).

According to Dr. Sporn, there is overwhelming evidence (and consensus among asbestos researchers) that there is

5. Parts of Dr. Sporn's deposition testimony are at Binder index E, exhibit 9 and index G, exhibit B; his report is at Binder index E, exhibit 2.

6. According to North River's experts, it is not possible to establish the date of the exposure that began the progression of the disease. At best, estimates can be made by working backwards from the date of manifestation. *See* report of Dr. Sporn, at 8 ("...there are individual variations that make it impossible to establish exactly what the threshold is and when it is reached....").

a threshold level below which the process of asbestos and asbestos-related cancer does not commence. "I disagree with any assertion that each and every pre-threshold exposure to asbestos contributes to any disease process as well as the assertion that the disease process begins at the cellular level upon an individual's first exposure to asbestos (T. 9)."

In summary, there is, according to Dr. Sporn, a consensus among asbestos researchers that in all likelihood it is not the initial exposure that begins the progression. Thus, science does not support the application of the multiple-trigger theory that begins with the initial inhalation.

In these summary judgment proceedings, North River is not asking me to make a ruling that science does not support the use of a multiple-trigger theory based on the initial exposure to asbestos. It only requests that I deny MSA's motion in order that a fact-finder can consider North River's contention that there is virtually no scientific support for the opinion that the progression of asbestos-related diseases begins with the initial exposure to asbestos.[7]

---

7. I find no merit to North River's contention that *J.H. France's* multi-trigger approach applies only to asbestosis. The Pennsylvania Supreme Court's opinion in *J.H. France* never restricted its analysis to asbestosis claims.

The Superior Court opinion in *J.H. France*, which adopted the continuous-trigger approach, said that the evidence establishes that there is a discrete injury occurring almost contemporaneously with the exposure to asbestos which "if one continues to be exposed to asbestos, will result in *asbestosis, mesothelioma or other asbestos-related disease."* 578 A.2d at 468, 474 (Pa. Super. 1990) (emphasis added). Thus, the court found to be dispositive the question of "under what circumstances can France reasonably conclude that coverage is provided for the *occurrence of asbestos-related diseases?" Id.* at 475 (emphasis added).

According to the Supreme Court opinion, the Superior Court reached the conclusion that the stages in the pathogenesis of asbestos-and silica-related diseases also trigger the liability of *J.H. France's* insurance carrier. The Supreme Court ruled that "we find no error in this analysis

Protection of Insured's Reasonable Expectations

I am rejecting North River's contention that I should not follow *J.H. France* even assuming the scientific community has rejected opinions that the initial exposure begins the progression of the disease. I am doing so because I believe that issues of insurance coverage dictated the result which the *J.H. France* court reached.

The court's opinion in *J.H. France* cited and relied upon *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981). In *Keene*, the insured (Keene) sought a declaratory judgment as to the rights and obligations of the parties under the comprehensive general liability policies issued to Keene or its predecessors from 1961 to 1980.

Between 1948 and 1972, Keene manufactured thermal insulation products that contained asbestos. As a result, it was named as a co-defendant with other companies in over 6,000 lawsuits alleging injury caused by exposure to Keene's asbestos products. From 1961 to 1980, several insurance companies provided insurance coverage to Keene under comprehensive general liability (CGL) insurance policies. In this lawsuit for declaratory relief, Keene contended that each insurance company covering

---

and conclusion. The insurance policy language and the evidence of the etiology and pathogenesis of *asbestos-related disease* compel us to reach this result." 626 A.2d at 506 (emphasis added). The court also affirmed the Superior Court's approval of the multiple-trigger theory of liability and thus, "every insurer which was on the risk at any time during the development of the claimant's asbestos-related disease has an obligation to indemnify J.H. France." *Id.* at 507.

In addition, the Pennsylvania Supreme Court opinion relied on the *Keene* case, discussed at pages 10-12 of this opinion, which applied the multiple-trigger approach to asbestos-related diseases.

Furthermore, assuming that *J.H. France* applied the multiple-trigger approach only to asbestosis, I extend its application to all cancer-related diseases caused by exposure to asbestos in order to protect MSA's reasonable expectations. *See* my discussion of protection of insured's reasonable expectations at pages 10-12 of this opinion.

any stage in the progression of asbestos-related diseases provides coverage for the full amount of the claim (or the full amount of the policy limits). The defendant insurance companies, on the other hand, proposed one of the other interpretations described at pages 2-3 of this opinion.[8]

The court first considered the language of the policy. It found that it did not provide any answers:

> The policy language does not direct us unambiguously to either the "exposure" or "manifestation" interpretation. In the context of asbestos-related disease, the terms "bodily injury," "sickness" and "disease," standing alone simply lack the precision necessary to identify a point in the development of a disease at which coverage is triggered. The fact that a doctor would characterize cellular damage as a discrete injury does not necessarily imply that the damage is an "injury" for the purpose of construing the policies. At the same time, the fact that an ordinary person would characterize a fully developed disease as an "injury" does not necessarily imply that the manifestation of the disease is the point of "injury" for purposes of construing the policies. In interpreting a contract, a term's ordinary definition should be given weight, but the definition is only useful when viewed in the context of the contract as a whole.

> Moreover, the legal definition of "injury" in other contexts informs the term's definition in this case only if the term operates in a functionally similar manner in the other contexts. In the areas of workmen's compensation, health insurance, and statutes of limitations, the concept of "injury" performs a function

---

8. While no insurance company favored Keene's proposed interpretation, they were not in agreement as to what interpretation they wanted the court to apply.

that is different from its function in the context of comprehensive general liability policies. Therefore, the term's definition in those contexts is only minimally relevant to the question at hand. *Instead, the purpose of the insurance policies must inform our construction of the term "injury".*

*Id.* at 1043-44 (footnote omitted) (emphasis added).

The court applied settled case law holding that whenever the language of an insurance policy is not clear, a court shall apply principles of insurance law embodied in each insurance agreement that coverage shall be dictated by the reasonable expectations of an objective insured. *Id.* at 1041-42.

The court stated that under the reasonable expectations standard, the policies that were issued to Keene were for the purpose of relieving Keene "of the risk of liability for latent injury of which Keene could not be aware when it purchased the insurance." *Id.* at 1047.

The court stated that in determining coverage, Keene's right to be free of all liability is paramount:

Although we have defined the term "injury," we have done so only as an incidental aspect of a logically prior determination of Keene's rights under the policies viewed in their entirety. The insurance policies provide Keene with the right to be free of all liability for asbestos-related disease, unless such a disease was known or knowable by Keene at the time it purchased an insurance policy. For that right to be preserved, each policy that Keene purchased between an initial exposure and the ultimate manifestation of a disease must be triggered.

*Id.* at 1048 (footnote omitted).

The *Keene* court posited a rule in which manifestation is the sole trigger of coverage to explain why such a rule would be inconsistent with the insurer's reasonable expectations:

> If we were to hold that only the manifestation of disease can trigger coverage, the insurance companies would have to bear only a fraction of Keene's total liability for asbestos-related diseases.
>
> The possibility of that result would undermine the function of the insurance policies. When Keene purchased the policies, it could have reasonably expected that it was free of the risk of becoming liable for injuries of which it could not have been aware prior to its purchase of insurance.

*Id.* at 1045-46 (footnote omitted).

The court rejected the ruling of the District Court that an insurer is obligated to pay only a *pro rata* share of Keene's liability because "Keene's security would be contingent on the existence and validity of all other applicable policies. Each policy, therefore, would fail to serve its function of relieving Keene of all risk of liability." *Id.* at 1048.

A Ruling in Favor of MSA

I now consider the present case.

Pennsylvania case law governing the interpretation of insurance policies does not differ from the analysis the court used in *Keene*.[9]

---

9. In this case, the language of the policies is ambiguous for the reasons set forth in *Keene-see* pages 10-11 of this opinion. Thus, I need not decide whether or not a court can consider an insured's reasonable expectation only in situations in which the Insurance contract is deemed ambiguous. *See Betz v. Erie Ins. Exchange*, 957 A.2d 1244, 1253 (Pa. Super. 2008).

In *Vale Chemical Co. v. Hartford Accident & Indem. Co.*, 490 A.2d 896, 902 (Pa. Super. 1985), *rev'd on other grounds*, 516 A.2d 684 (Pa. 1986), the court stated:[10]

> As we find that the policy language in the instant case does not direct us unambiguously to either an "exposure" or "manifestation" interpretation, we must look to the general expectations of the insured at the time of purchase in order to determine the extent of coverage. Manufacturers' policy was entitled "Products Public Liability Policy." The fact that Vale purchased a general products liability policy indicates that it reasonably expected that it was free of the risk of becoming liable for latent injuries which were incurred during the policy period but manifested at a later time. There is no clear indication in the manufacturers' policy, considering its totality, that the parties intended to exclude coverage for these latent diseases.

(Citations omitted).

In *Butterfield v. Giuntoli*, 670 A.2d 646, 653 (Pa. Super. 1995), the court stated that when interpreting an insurance contract where a policy provision is ambiguous, "the proper focus of this scrutiny is the reasonable expectations of the insured at the time of purchase."

In *Betz v. Erie Ins. Exchange*, 957 A.2d 1244, 1253 (Pa. Super. 2008), the court stated that the proper focus regarding issues of coverage under insurance contracts is the "reasonable expectation of the insured."

For the reasons set forth in *Vale*, 490 A.2d at 902, and in *Keene* (*see* page 11 of this opinion), I find that when MSA purchased the North River policies, it would have reasonably expected that it was free of the risk of

---

10. Vale was cited with approval in J.H. France at 626 A.2d at 507.

becoming liable for injuries of which it could not have been aware prior to the purchase of the policy. To meet these expectations, the coverage must include any claims for which the insured may be liable under tort law.

Consider the following fact situation: A steelworker was diagnosed with mesothelioma in 2007. He worked at West End Steel from 1970-1987. He was exposed at the workplace to fire-retardant asbestos manufactured by MSA from 1970-1972 and to the fire-retardant asbestos manufactured by industrial products (now out of business) from 1973-1987.

The steelworker sued only MSA. The steelworker received a verdict of $1 million based on expert testimony, applying the frequency, regularity, and progression test, that the exposure during the 1970-1972 period, as described by the plaintiff, was a substantial cause of the cancer. *See Betz v. Pneumo Abex, LLC*, 44 A.3d 27 (Pa. 2012); *Gregg v. V-J Auto Parts*, 943 A.2d 216 (Pa. 2007). MSA sought indemnification from its insurers whose policies covered the period from 1970-1972. The insurers contended that there is no coverage because scientists studying asbestos have concluded that it is far more likely than not that the exposure to asbestos that started the progression of the steelworker's disease leading to manifestation occurred, at the earliest, at least several years after 1972.

However, in interpreting the insurance policies covering the years 1970-1972, it does not matter whether or not the insured can prove that the exposure that caused the progression occurred between 1970 and 1972. Since MSA was found to be liable to the steelworker under Pennsylvania tort law for exposures between 1970 and 1972, the insurance policies covering these years should provide coverage. Otherwise, MSA does not receive the

protection it would have reasonably expected.

A question that the insurance company may ask is why is the company required to provide coverage for policies covering 1970-1972 if the company can prove that in all likelihood there were no injuries from exposure to asbestos leading to progression and manifestation for the period between 1970-1972.

My response is that the insurer is basically saying that it has no obligation to provide coverage when tort law gets it wrong. This position is contrary to an interpretation of the policy based on the insured's reasonable expectations that the insurance policies relieve MSA of the risk of liability for claims MSA is obligated to pay arising out of exposures between 1970 and 1972.

Using the steelworker example, the policy period is 1970 to 1972. The jury concluded that exposure to MSA's products between 1970 and 1972 was a cause of the plaintiff's disease. Thus, the insured became legally obligated to pay the amount of the verdict because of the jury's determination that there is a link between the exposure between 1970 and 1972 and the disease. Under the reasonable expectations interpretation, the insurer agreed to pay all sums which the insured became legally obligated to pay based on the exposures between 1970 and 1972.

There would be a very different landscape in Pennsylvania if I agreed with North River that *J.H. France's* multi-trigger approach begins only when the insured can establish the date of the exposure which began the progression. Under *J.H. France*, the period of coverage is easily determined — what is the date of the initial exposure and what is the date of manifestation. However, if coverage begins only when the insured can establish the

date of the exposure that began the progression, this will be a case-by-case determination based on expert testimony.

*J.H. Frances'* multi-trigger approach that begins with the initial exposure, reaches every claim that is viable under tort law. If coverage begins only on the date of the exposure that began the progression, there will be no certainty as to the period of coverage, and there will likely be claims for which the insured is liable that are not within a period of coverage.

In *Ins. Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), also cited approvingly by the *J.H. France* court, the court stated that the use of the date of the first exposure that began the disease process is an interpretation no one wants because the cost of the litigation would be prohibitive if medical testimony as to the origin would have to be taken in each of the thousands of asbestosis cases. Furthermore, "it is almost impossible for a doctor to look back and testify with any precision as to when the development of asbestosis 'crossed the line' and became a disease." *Id.* at 1218. On the other hand, a ruling that bodily injury takes place upon initial exposure to asbestos is "both a literal construction of the policy language and the construction which maximizes coverage. It is also the construction which, we think, best represents what the contracting parties intended." *Id.* at 1223.

In *Commercial Union Ins. Co. v. Sepco Corp.*, 765 F.2d 1543 (11th Cir. 1985), the insurer contended that the medical evidence in the case contradicts the essential tenet of the exposure theory that each inhalation of asbestos fibers results in bodily injury. The insurer offered expert testimony "to the effect that not everyone exposed to asbestos contracts an asbestos-related disease such as asbestosis and that exposure to asbestos does not produce

instantaneous sub-clinical cellular changes in the lungs." *Id.* at 1545-46.

The court responded by stating: "We believe that the exposure theory is more accurately analyzed as positing not that each inhalation of asbestos fibers results in bodily injury, but rather that every asbestos-related injury results from inhalation of asbestos fibers...[B]ecause it is impossible practically to determine the point at which the fibers actually imbed themselves in the victim's lungs, [equating] exposure to asbestos with 'bodily injury' caused by the inhalation of asbestos is the 'superior interpretation of the contract provision.'" *Id.* at 1546.

In summary, the multi-trigger approach of *J.H. France* where coverage begins with the initial exposure to asbestos and ends at the date of manifestation serves the function of relieving MSA of the risk of liability for injuries for which MSA may be found liable. There may be other approaches that achieve the same result. However, the bottom line is that the reasonable expectations of the insured should be protected through an interpretation of insurance coverage that parallels the insured's liability, and *J.H. France* provides such protection.

For these reasons, I enter the following order of court:

## ORDER OF COURT

On this 13 day of February, 2014, it is hereby ordered that Mine Safety Appliances Company's motion is granted, and the continuous-trigger approach adopted in *J.H. France Refractories Co. v. Allstate Ins. Co.* determines which policies apply to bodily injury claims involving mesothelioma or asbestos-related lung cancer arising out of exposure to asbestos.